IN THE MATTER OF HAGUE

Docket No. 65348. Argued November 17, 1980 (Calendar No. 12).— Decided February 1, 1982. Rehearing denied 413 Mich 1106.

The Judicial Tenure Commission found William C. Hague, a judge of the Recorder's Court of Detroit in the Traffic and Ordinance Division, guilty of judicial misconduct, and recommended that he be suspended from judicial office for 60 days without pay. The respondent was found to have disobeyed valid orders of superintending control from the Wayne Circuit Court concerning his dismissal of prostitution cases initiated by "appearance" or traffic ticket forms, refused to follow the decisions of the Court of Appeals on the constitutionality of the City of Detroit's gun-control ordinance, abused the contempt power, and improperly excluded attorneys from his courtroom. The respondent appeals.

In a unanimous opinion by Justice Ryan, the Supreme Court *held:*

The respondent is guilty of the misconduct charged and his behavior has been so clearly prejudicial to the administration of justice that he is suspended from judicial office for 60 days without pay.

1. The issue is not whether the orders of superintending control were correctly issued by the Wayne Circuit Court to stop Judge Hague's dismissal of the complaints, but whether he was bound to obey them. An order entered by a court with proper jurisdiction must be obeyed even if it is clearly incor-

REFERENCES FOR POINTS IN HEADNOTES

[1-6] 20 Am Jur 2d, Courts §§ 111-117.

[7, 10] 20 Am Jur 2d, Courts §§ 186, 187.

[8] 20 Am Jur 2d, Courts §§ 1, 12, 64 *et seq.*

[9] 20 Am Jur 2d, Courts § 183 *et seq.*

[11-15] 7 Am Jur 2d, Attorneys at Law § 41 *et seq.*

17 Am Jur 2d, Contempt §§ 62-76, 115.

20 Am Jur 2d, Courts § 39.

63 Am Jur 2d, Prosecuting Attorneys § 25 *et seq.*

[16] 7 Am Jur 2d, Attorneys at Law § 88.

[17] 20 Am Jur 2d, Courts § 65.

46 Am Jur 2d, Judges § 188.

rect. The General Court Rules of 1963 confer authority on the Wayne Circuit Court to issue orders of superintending control to the Traffic and Ordinance Division of Recorder's Court, which is indisputably a "lower court" to the circuit court. The availability of an appeal in the individual case does not preclude superintending control when appeal does not provide adequate relief. A superior court always has jurisdiction to issue an order of superintending control; the inadequacy of the appeal is not a jurisdictional test but merely a procedural requirement to be met before relief can be granted. The case-by-case appeal of the hundreds of prostitution cases dismissed by Judge Hague would not have been a practical, efficient, or commonsense remedy for his persistent, wholesale dismissal of such cases during his service as presiding judge because of the delay and expense inherent in such a large number of appeals.

2. Judge Hague contends that he did not violate the orders because none of them clearly and unambiguously forbade dismissal of the cases for the specific reasons he announced. The record shows that the respondent made no serious good-faith attempt to obey the orders from the Wayne Circuit Court or the Court of Appeals. The thrust of the orders was to enjoin Judge Hague from dismissing the prostitution cases on a wholesale basis for the use of the printed traffic form as the charging document, no matter what other procedural reason he might give. Judge Hague knew or should have known that he was directly violating the import and spirit, as well as the substance, of the orders of superintending control. The maintenance of public confidence in the integrity of the judiciary required Judge Hague to avoid even the appearance of defiance of valid judicial orders. If he wished to question in good faith the precise meaning of the orders, he should have sought clarification and guidance from the superior courts.

3. There is no doubt that Judge Hague understood clearly that he had been ordered by the circuit court to end his practice of dismissing prostitution cases for reasons of form and procedure and that he disobeyed the orders nevertheless. Intentional disobedience of valid orders of superintending control necessarily constitutes judicial misconduct; public confidence, integrity, and impartiality of the judiciary can only be eroded by the spectacle of a judge refusing to follow the law.

4. Failure to follow the rule of stare decisis is not per se judicial misconduct. The Judicial Tenure Commission would be an inappropriate forum in which to correct erroneous judicial decisions made in good faith; it may not function as an appellate body. However, a judge is not free to willfully refuse to

enforce the law. The judiciary must strive to create and preserve the image of the judicial system as an independent, impartial source of reasoned actions and decisions. The decision of Judge Hague not to enforce the City of Detroit's gun-control ordinance was directly contrary to precedent of which he was aware and obviously based on his widely publicized personal belief about what the law should be rather than what it is. He also disagreed with the wisdom and constitutionality of the mandatory minimum sentences of the prostitution and gun-control ordinances. When a panel of the Court of Appeals, as it did in the precedential cases, has jurisdiction and declares a law to be valid and enforceable, a trial judge is bound by that decision until another panel of the Court of Appeals or the Supreme Court rules otherwise. Judge Hague not only disregarded binding precedent, he publicly declared his refusal, saying that the Court of Appeals does not make the law in this state. The respondent's dismissal of gun-control cases was not the result of reasoned judgment but the product of his personal prejudices. His lack of enforcement of the ordinance and willful disregard of the law violated his oath of office, engendered disrespect for the law and improperly interfered with the proper administration of justice.

5. The decision whether to initiate proceedings under the prostitution ordinance belongs to the prosecutor, not the trial judge. Therefore, the order by Judge Hague from the bench that he would hold the Assistant Corporation Counsel for Detroit, or the police, in contempt merely for initiating the prosecution of prostitution cases under the Detroit ordinance was improper. The power of contempt is awesome and must be used with the utmost restraint. The completely unjustified threat of contempt was conduct prejudicial to the administration of justice and an abuse of the court's power of contempt which constitutes judicial misconduct warranting discipline.

6. A court should use the least possible sanction adequate to achieve the proper end sought, and it necessarily has the inherent power to preserve or restore order by temporarily ejecting from the courtroom disruptive and disorderly persons, including attorneys. However, the power to remove disruptive attorneys may not be used as an artifice or guise to eject counsel with whom a judge has a personal or professional disagreement, whose presence inhibits the court, or toward whom the judge entertains a personal animosity but who is not, in fact, disruptive or disorderly. It is evident from the record that Judge Hague barred attorneys representing the City of

Detroit from his courtroom because of their roles in obtaining the orders of superintending control against him. The power to discipline members of the State Bar, except a proper adjudication of contempt, particularly the power to limit or preclude an attorney from practicing law, is reserved to the Supreme Court. On the facts of this case, ejecting attorneys and permanently barring them from practicing law in his courtroom was unwarranted, unjustified, and an abuse of the powers of his office.

7. The respondent's instruction to an assistant prosecuting attorney not to authorize certain warrants for the statutory offense of driving while the defendant's license is suspended was not coupled with a threat of contempt. While the instruction was beyond the respondent's authority, it was not equivalent to action on a matter before the court and the respondent is not charged with improperly dismissing such cases. Gratuitous advice to officers of the executive department not to prosecute certain cases is not a violation of the constitutional doctrine of separation of powers and is not an abuse of judicial authority.

8. The respondent in this case is at ideological war with local prosecuting authorities over the enforcement of non-traffic ordinances with which he does not agree. The depth of his conviction has blinded him to the limits of his adjudicative role, moved him to deny the authority of higher courts, and ultimately led him to disobey orders of those courts because he did not agree with them. In the process he abused the power of contempt and attempted to usurp the authority of the Supreme Court. The respondent's inability to separate the authority of the judicial office he holds from his personal convictions led to willful misconduct designed solely to frustrate enforcement of laws he was bound by oath to uphold. The misconduct was repeated and defiant, and, because of the widespread publicity given to it, can only have seriously damaged public esteem for the judiciary, engendered disrespect for the law, exposed the courts to obloquy, contempt, censure and reproach, and brought ridicule on Judge Hague as a judicial officer.

Judge Hague is suspended without pay from his judicial duties and administrative responsibilities for 60 days.

1. SUPERINTENDING CONTROL — JUDGES.

A judge must obey an order of superintending control entered by a court with proper jurisdiction even if it is clearly incorrect (GCR 1963, 711).

2. SUPERINTENDING CONTROL — RECORDER'S COURT — TRAFFIC AND ORDINANCE DIVISION.

The General Court Rules of 1963 confer authority on the Wayne

Circuit Court to issue orders of superintending control to the
Traffic and Ordinance Division of Recorder's Court of Detroit,
which is indisputably a "lower court" to the circuit court (GCR
1963, 711).

3. SUPERINTENDING CONTROL — JURISDICTION — APPEAL.

The availability of an appeal in the individual case does not
preclude superintending control when appeal does not provide
adequate relief; a superior court always has jurisdiction to issue
an order of superintending control, and the inadequacy of the
appeal is not a jurisdictional test but merely a procedural
requirement to be met before relief can be granted (GCR 1963,
711).

4. JUDGES — SUPERINTENDING CONTROL — JURISDICTION — APPEAL.

A judge of the Recorder's Court of Detroit in the Traffic and
Ordinance Division was bound to obey orders of superintending
control issued by the Wayne Circuit Court to stop his dismissal
of prostitution cases initiated by "appearance" or traffic ticket
forms where the case-by-case appeal of the hundreds of cases
dismissed by him would not have been a practical, efficient, or
commonsense remedy for his persistent, wholesale dismissal of
such cases (Code of Judicial Conduct, Canon 2; GCR 1963, 711).

5. JUDGES — SUPERINTENDING CONTROL — MISCONDUCT.

The maintenance of public confidence in the integrity of the
judiciary requires a judge to avoid even the appearance of
defiance of valid judicial orders; if he wishes to question in good
faith the precise meaning of orders of superintending control,
he should seek clarification and guidance from the superior
courts (Code of Judicial Conduct, Canon 2).

6. JUDGES — SUPERINTENDING CONTROL — MISCONDUCT.

Intentional disobedience of valid orders of superintending control
necessarily constitutes judicial misconduct; public confidence,
integrity, and impartiality of the judiciary can only be eroded
by the spectacle of a judge refusing to follow the law (Code of
Judicial Conduct, Canon 2).

7. JUDGES — COMMON LAW — STARE DECISIS — MISCONDUCT.

Failure to follow the rule of stare decisis is not per se judicial
misconduct; however, a judge is not free to willfully refuse to
enforce the law (Code of Judicial Conduct, Canons 2, 3).

8. JUDGES — COMMON LAW — JURISPRUDENCE.

The judiciary must strive to create and preserve the image of the

judicial system as an independent, impartial source of reasoned actions and decisions (Code of Judicial Conduct, Canons 2, 3).

9. JUDGES — STARE DECISIS — MISCONDUCT.

A decision of a Recorder's Court Judge in the Traffic and Ordinance Division not to enforce the City of Detroit's gun-control ordinance violated his oath of office, engendered disrespect for the law and improperly interfered with the proper administration of justice where it was directly contrary to precedent of which he was aware and obviously based on his widely publicized personal belief about what the law should be rather than what it is, and the judge publicly declared his refusal to follow precedent, saying that the Court of Appeals does not make the law in this state (Const 1963, art 11, § 1; Code of Judicial Conduct, Canon 2; GCR 1963, 953[1]).

10. JUDGES — STARE DECISIS — COURT OF APPEALS.

When a panel of the Court of Appeals has jurisdiction and declares a law to be valid and enforceable, a trial judge is bound by that decision until another panel of the Court of Appeals or the Supreme Court rules otherwise; whatever his contrary personal view of appellate authority, a judge is not free to disregard it (Code of Judicial Conduct, Canon 3; GCR 1963, 912).

11. JUDGES — CONTEMPT — PROSECUTING ATTORNEYS — MISCONDUCT.

The decision whether to initiate proceedings under the prostitution ordinance of the City of Detroit belongs to the prosecuting attorney, not the trial judge; therefore, an order from the bench that he would hold the Assistant Corporation Counsel for Detroit, or the police, in contempt merely for initiating the prosecution of prostitution cases under the Detroit ordinance was improper.

12. JUDGES — CONTEMPT — MISCONDUCT.

The power of contempt is awesome and must be used with the utmost restraint; a completely unjustified threat of contempt is conduct prejudicial to the administration of justice and abuse of the court's power of contempt which constitutes judicial misconduct warranting discipline (GCR 1963, 932.4[b][iv]; GCR 1963, 953[1]; Code of Professional Responsibility and Canons, DR 1-102[A][5]).

13. JUDGES — ATTORNEYS — DISRUPTIVE CONDUCT — INHERENT POWER.

A court should use the least possible sanction adequate to achieve the proper end sought, and it necessarily has the inherent

power to preserve or restore order by temporarily ejecting from the courtroom disruptive and disorderly persons, including attorneys (Code of Judicial Conduct, Canon 3).

14. JUDGES — ATTORNEYS — DISRUPTIVE CONDUCT — INHERENT POWER.

The power to remove disruptive attorneys from the courtroom may not be used as an artifice or guise to eject counsel with whom a judge has a personal or professional disagreement, whose presence inhibits the court, or toward whom the judge entertains a personal animosity but who is not, in fact, disruptive or disorderly (Code of Judicial Conduct, Canon 3).

15. JUDGES — ATTORNEYS — DISCIPLINE.

Ejecting attorneys and permanently barring them from practicing law in a judge's courtroom is unwarranted, unjustified and an abuse by the judge of the powers of his office where the attorneys were not ejected because of any disruptive or disorderly conduct, but because of their roles in obtaining orders of superintending control against the judge (Code of Judicial Conduct, Canon 3).

16. ATTORNEY AND CLIENT — DISCIPLINE — PRACTICE OF LAW — COURTS.

The power to discipline members of the State Bar, except a proper adjudication of contempt, particularly the power to limit or preclude an attorney from practicing law, is reserved to the Supreme Court (Const 1963, art 6, § 5; MCL 600.904; MSA 27A.904).

17. JUDGES — MISCONDUCT — PROSECUTING ATTORNEYS — SEPARATION OF POWERS.

Gratuitous advice by a trial judge to officers of the executive department not to prosecute certain cases is not a violation of the constitutional doctrine of separation of powers and is not an abuse of judicial authority (Const 1963, art 3, § 2).

*Joseph F. Regnier,* Executive Director and General Counsel, *Thomas L. Prowse,* Co-Examiner, and *Stanley T. Dobry* and *Thomas A. Hallin,* Staff Attorneys, for the Judicial Tenure Commission.

*Joseph Earl Jackson* for respondent.

RYAN, J. This is a judicial discipline proceeding in which Judge William C. Hague of the Record-

er's Court, Traffic and Ordinance Division,[1] is charged with four general categories of misconduct:

I. Disobedience of valid orders entered by superior courts,

II. Refusal to follow the decisions of higher courts,

III. Abuse of the contempt power, and

IV. Improperly excluding attorneys from his courtroom.

Upon *de novo* review of the record, we are convinced that respondent is guilty of misconduct in each of the four categories and that his behavior has been so clearly prejudicial to the administration of justice,[2] that we adopt the recommendation of the Judicial Tenure Commission that he be suspended from judicial office for a period of 60 days without pay.

## I. DISOBEDIENCE OF VALID ORDERS ENTERED BY SUPERIOR COURTS

The Detroit prostitution ordinance,[3] so called, was amended in December, 1977 to provide for a mandatory jail sentence of 20 days upon conviction for accosting and soliciting for purposes of prostitution, under certain circumstances. The three judges of the Traffic and Ordinance Division of the Recorder's Court, in which such cases were heard, regularly rotated duty as presiding judge for two-week periods. The duties of presiding judge included conducting arraignments on non-traffic ordinance violations, accepting guilty pleas in such

---

[1] The Traffic and Ordinance Division of the Recorder's Court was abolished on September 1, 1981, and its jurisdiction vested in the newly created 36th District Court. See MCL 600.9941; MSA 27A.9941.

[2] Const 1963, art 6, § 30; GCR 1963, 932.4(b)(iv).

[3] Detroit City Code, § 39-1-52.

cases, and apportioning the work of the court to the other two judges and nine referees. On February 6, 1978, Judge Hague began his regularly scheduled two-week assignment as presiding judge and immediately began systematically dismissing prostitution cases for the stated reason that the preprinted citation or ticket forms which had been issued to defendants as the charging document could not be used to initiate non-traffic ordinance violation cases.

These same "appearance" or "traffic ticket" type forms had been used in the Traffic and Ordinance Division for many years to initiate prostitution ordinance violation cases. After Judge Hague had dismissed a substantial number of such cases, attorneys for the City of Detroit filed a complaint for a writ of superintending control in the Third Judicial Circuit Court (Wayne County) requesting that respondent be ordered to cease dismissing prostitution cases for the reasons he had been giving. On February 17, 1978, Chief Judge Richard Dunn issued a temporary order of superintending control directed to respondent which ordered, in pertinent part, that:

"Judge Hague cease dismissing non-traffic ordinance complaints, as are presently being used, or any other complaints based upon objection to their form until further order of this court."

Despite the superintending control order, Judge Hague continued to dismiss prostitution cases. At least 47 such cases were dismissed between March 20 and 23 while the February 17 superintending control order was in effect. Of that number, 18 cases were dismissed with no reason being given, while 27 were dismissed for a lack of an arrest warrant in the file. Again, the City of Detroit

sought an order of superintending control in order to preclude further dismissals for the claimed procedural deficiency Judge Hague was asserting. On March 24, 1978, after a hearing, Chief Judge Dunn issued a permanent order of superintending control in which it was specifically found that the procedure employed by the Detroit Police Department and the Law Department of the City of Detroit in bringing the prostitution cases to court was proper and in compliance with all statutory requirements. The order declared that the dismissals had been "improper", and directed that:

"Judge Hague absolutely cease and desist from dismissing non-traffic ordinance complaints, as are presently being used, or any other complaints based upon objection to their form or the procedure employed for presenting said complaints to his court."[4]

Respondent continued, however, to dismiss "non-traffic ordinance complaints", including at least 92 prostitution cases, during March 25 through May 2, most of them for the announced reason that there was no arrest warrant in the file.

On May 3, 1978, upon the petition of the City of Detroit, Judge Dunn issued a third superintending control order denominated "Order of Clarification". It ordered Judge Hague

"(1) to accept pleas of guilty in City of Detroit ordi-

[4] Judge Dunn deleted the following language from the proposed order:

"[A]nd more specifically, refrain from adjourning or dismissing said complaints based on objection to their form, the procedure employed, or the necessity of obtaining a warrant."

Counsel for the Judicial Tenure Commission suggests that the reason the stricken language was deleted was because it was essentially repetitious of the remaining language of the order. While that explanation is plausible, we do not consider it necessary to make a finding on the point in order to resolve the issues before the Court.

nance violation cases where appearance tickets have been filed with the court; and (2) to order further proceedings, once a sworn complaint or appearance ticket is filed with the court, in said cases, where the accused pleads not guilty or stands mute."

The next day, May 4, 1978, Judge Hague responded by *sua sponte* issuing a document entitled "Order of Compliance", to be effective May 8, which required the City of Detroit to prosecute non-traffic ordinance violations with a formal complaint and warrant rather than the "ticket" form of complaint specifically approved in Judge Dunn's orders of superintending control and threatened contempt of court for failure to comply with his order. It provided in pertinent part:

"It is hereby ordered that the City of Detroit Law Department and the City of Detroit Police Department prepare non-traffic ordinance violations on form C.D. 104 WA(73) thereby submitting the court a complaint and warrant incorporating said complaint therein effective May 8, 1978, at 9:00 a.m.

"Failure to comply with this order will result in a citation for contempt of court."

The order was immediately vacated by Judge Dunn.

Judge Hague continued the wholesale dismissal of prostitution cases. Evidence produced before the Master appointed by this Court discloses that at least 26 cases were dismissed during the week of May 4-11, in direct violation of the May 3 superintending circuit court order of clarification.

The respondent's persistent dismissal of prostitution cases, in spite of three separate orders of superintending control, resulted in a May 25, 1978

order of the circuit court finding him in contempt[5] followed by a fourth superintending control order on May 30, 1978, essentially reiterating and clarifying the substance of the three previous orders. When, despite four orders of superintending control, Judge Hague continued to dismiss virtually all the prostitution cases being brought to the court, an order was issued by Chief Judge Dunn on June 15, 1978 directing Judge Hague to show cause why he should not be held in contempt of court. Upon appeal by Judge Hague to the Court of Appeals, the show cause proceeding was ordered stayed by that Court by its order of June 22, 1978, which provided in part:

"It is further ordered on the court's own motion that no cases involving non-traffic ordinance violations shall be referred to the Honorable William C. Hague for hearing in the Recorder's Court, Traffic and Ordinance Division, until the further order of this court."

Despite the Court of Appeals order and while his appeal to that Court was pending, Judge Hague accepted referral of and dismissed 11 more prostitution cases.

The factual background developed above is essentially undisputed. The dispositive legal issues are whether the circuit court's superintending control orders were valid; if so, whether Judge Hague's behavior violated the terms of the orders; and, if so, whether that action amounted to judicial misconduct for which discipline is warranted.

[5] The May 25 order denominated "Order and Finding of Contempt" apparently was not in fact an actual adjudication of contempt but a finding by the circuit court that Judge Hague had violated the May 3 superintending control order by dismissing certain listed prostitution cases. No penalty was imposed.

## A

Much of Judge Hague's argument to this Court is devoted to the proposition that the superintending control orders issued by the circuit court were improper and not binding upon him.[6] In addition, he argues that the City of Detroit prostitution and gun-control ordinances are invalid; that the procedures utilized to initiate ordinance cases are unconstitutional; that the equitable writ of superintending control should have been denied for lack of "clean hands"; that another adequate remedy was available; and that even if he was wrong, he was not guilty of "such an abuse of discretion as would amount to a failure to perform a clear legal duty". *People v Flint Municipal Judge,* 383 Mich 429; 175 NW2d 750 (1970).

These arguments, except for the last of them, are, in a word, irrelevant in this judicial discipline case, but they cast considerable light upon the real basis for the behavior of Judge Hague which precipitated these proceedings. The issue before this Court, in this first of the four areas of misconduct charged, is solely whether Judge Hague was bound to obey the orders of superintending control.

An order entered by a court without jurisdiction "is absolutely void", *Fox v Board of Regents of the University of Michigan,* 375 Mich 238, 242; 134 NW2d 146 (1965). As in the law of contempt, Judge Hague was free to disregard an order void for lack of jurisdiction. *Cf. United States v United Mine Workers of America,* 330 US 258, 293; 67 S Ct 677; 91 L Ed 884 (1947); *Walker v City of Birmingham,* 388 US 307, 320-321; 87 S Ct 1824;

---

[6] Although not controlling here, the validity of the May 30, 1978 order was upheld in *Detroit v Recorder's Court Judge, Traffic & Ordinance Division,* 85 Mich App 284; 271 NW2d 202 (1978), *lv den* 404 Mich 808 (1978).

18 L Ed 2d 1210 (1967). In contrast, an order entered by a court with proper jurisdiction must be obeyed even if the order is clearly incorrect. *State Bar of Michigan v Cramer,* 399 Mich 116, 125; 249 NW2d 1 (1976), and cases cited therein. See also *City of Troy v Holcomb,* 362 Mich 163; 106 NW2d 762 (1961); *Lester v Sheriff of Oakland County,* 84 Mich App 689, 697-698; 270 NW2d 493 (1978).

Respondent was obligated to obey the orders of superintending control unless the Third Judicial Circuit Court was without jurisdiction in issuing them.

The circuit courts have general superintending control over all inferior courts, subject to rules of the Supreme Court. MCL 600.615; MSA 27A.615; Const 1963, art 6, § 13. This Court has limited, by court rule, the extraordinary writ of superintending control by providing that a complaint may not be filed if another adequate remedy is available and, if an appeal is available, the complaint for superintending control must be dismissed. GCR 1963, 711.2, 711.4(b). The City of Detroit acknowledged that it could have appealed each of the hundreds of prostitution and gun-control cases dismissed by Judge Hague. MCL 770.12; MSA 28.1109; GCR 1963, 806; GCR 1963, 703. The respondent relies upon the language of GCR 711.4(b), amended in 1977, requiring dismissal if an appeal is available, considers the catchline heading "Jurisdiction" of 711.4 and concludes that if an appeal is available, jurisdiction to entertain the superintending control action does not exist.

The rule provides:

"Rule 711. Superintending Control.

\* \* \*

".2 Policy Concerning Use. If another adequate remedy is available to the party seeking the order, a complaint for superintending control may not be filed. See GCR 1963, 701.1(b); 711.4(b); 862.5(a).

\*   \*   \*

".4 Jurisdiction.

"(a) The Supreme Court, the Court of Appeals, and the circuit court have jurisdiction to issue superintending control orders to lower courts and tribunals.

"(b) When an appeal in the Supreme Court, the Court of Appeals or the circuit court is available, that method of review must be used. If superintending control is sought and an appeal is available, the complaint for superintending control must be dismissed."

While Judge Hague's jurisdictional argument is not without arguable merit, it focuses upon 711.4(b) of the rule and ignores the straightforward text of 711.4(a) which confers authority upon the Third Judicial Circuit Court to issue orders of superintending control to the Traffic and Ordinance Division, indisputably a "lower court" to the circuit court. Further, it must be noted that the catchline heading, "Jurisdiction", cannot be considered as part of the text or an aid in construing the rule. GCR 1963, 15. It is clear from this Court's opinion in *Cahill v Fifteenth District Judge,* 393 Mich 137; 224 NW2d 24 (1974), that availability of an appeal in the individual case does not preclude superintending relief when that procedure does not provide an adequate remedy.[7] Implicit in *Cahill* is the idea that a superior court always has jurisdiction to issue an order of superintending control and that adequacy of the appeal remedy is not a jurisdictional test but merely a

[7] We reject respondent's contention that superintending control can only apply to the general practices of an entire bench. While that was the case in *Cahill, supra,* nothing in GCR 1963, 711 suggests any such limitation.

procedural requirement to be met before relief can be granted.

It is apparent to us, however, that the case-by-case appeal to the Court of Appeals of the hundreds of prostitution cases dismissed by Judge Hague would not have been a practical, efficient or commonsense remedy for his persistent, wholesale dismissal of all prostitution cases prosecuted in the City of Detroit during his service as presiding judge. The delay and expense inherent in the appeal of dozens upon dozens of such cases, while during their pendency Judge Hague continued to refuse to enforce the ordinance, suggests persuasively that, in the circumstances, case-by-case appeal was neither an adequate nor realistic remedy.

### B

Judge Hague admits, and the record confirms, that he continued to dismiss prostitution ordinance cases after the entry of the superintending control orders of February 17, 1978; March 24, 1978; May 3, 1978; May 30, 1978 and the order to show cause of June 22, 1978. He contends, however, that he did not violate the orders, since none of them clearly and unambiguously forbade him to dismiss the cases for the specific reasons announced.[8]

A reading of the immensely voluminous record of thousands of pages leaves us with the abiding conviction that Judge Hague knew exactly what the superintending control orders forbade him to do, and did so anyway. The record reveals that the

---

[8] The circuit court issued a total of five orders, including four orders of superintending control, the May 3 order denominated "Order of Clarification" and one order to show cause. Judge Hague appeared before Judge Dunn in connection with these matters on at least two occasions.

respondent made no serious good-faith attempt to obey the various orders from superior courts, either the circuit court or the Court of Appeals. He stated on the record, from the bench in his courtroom:

"Do you understand that circuit court has no jurisdiction over me? Do you understand that?"

As to the circuit court orders, Judge Hague wrote:

"We have had a number of orders that have needed repeated clarification. I neither wrote them *nor read them.*" (Emphasis added.)

Again, he stated:

"Judge Dunn is not big enough to make me do that, and he'll find out in the long run."

Judge Hague had this to say, on the record, from the bench, about the Court of Appeals:

"Do you know that the Court of Appeals doesn't establish the law in this state?"
"I'm throwing the gun cases out.

\* \* \*

"Tell them [the Michigan Court of Appeals] what I'm doing. \* \* \* I don't have to jump through a hoop for the Court of Appeals. I'm an elected judge."

We agree with the Judicial Tenure Commission that the thrust of the superintending control orders and the Court of Appeals stay order was to enjoin Judge Hague from dismissing prostitution cases on a wholesale basis for objection to the use of the "appearance" or "traffic ticket" type printed form as the charging document, no matter what

other procedural reason he might assign. The evidence produced before the Master is compelling that Judge Hague knew or should have known that he was in direct violation of all four orders of superintending control. *In the Matter of Bennett,* 403 Mich 178, 188; 267 NW2d 914 (1978).

The maintenance of public confidence in the integrity of the judiciary required Judge Hague to avoid even the *appearance* of defiance of valid judicial orders. If he wished to question in good faith the precise meaning of the superintending control orders, he should have taken the initiative in seeking clarification and guidance from the superior court. Similarly, when the Court of Appeals ordered on June 22, 1978 that no cases involving non-traffic ordinance violations be "referred" to Judge Hague and he had any question whether he could continue to hear such cases, he should have resolved the question not in favor of apparent defiance, but by a request for clarification.

From a careful examination of the orders in question, together with Judge Hague's testimony before the Master concerning his controversy with the circuit court, and upon consideration of the record evidence of the respondent's long history of publicly announced disapproval of the prostitution ordinance, we have no doubt that he understood clearly that he had been ordered by the circuit court to end his practice of dismissing prostitution cases for reasons of form and procedure, and that he disobeyed the orders nevertheless.

It seems clear beyond peradventure that, in this case, Judge Hague's intentional disobedience of valid orders constitutes judicial misconduct. Public confidence in the integrity and impartiality of the judiciary can only be eroded by the spectacle of a

judge refusing to follow the law. Code of Judicial Conduct, Canon 2(B). This Court held in *In the Matter of Bennett, supra,* 188-189, that violation of a valid superintending control order "necessarily hinders the administration of justice".

## II. Refusal to Follow the Decisions of Higher Courts

Several years prior to the events here involved, Detroit adopted its gun-control ordinance[9] which provided for a mandatory minimum penalty upon conviction of a $400 fine and "a term of imprisonment" if, at the time of the violation, the firearm is loaded.

Shortly thereafter, Judge Hague held this ordinance to be unconstitutional for the reasons, *inter alia,* that the state had preempted the firearm-control field.

The City of Detroit sought and obtained a writ of superintending control in the circuit court. The circuit judge ruled in a written opinion that the state had not preempted the gun-control field and that the ordinance was valid. Judge Hague appealed to the Court of Appeals which affirmed the circuit court, declaring:

"We therefore conclude that the State of Michigan has not preempted firearms control. The circuit court order of superintending control is affirmed." *Detroit v Recorder's Court Judge, Traffic & Ordinance Division,* 56 Mich App 224; 223 NW2d 722 (1974).

Judge Hague continued to dismiss gun-control cases at the arraignment or, upon trial, finding defendants not guilty for the announced reason

---

[9] Detroit City Code, §§ 66-4-2, 66-5-1.

that the ordinance violates the constitutional right to bear arms and that the city is without authority to legislate a mandatory minimum sentence.

Once again the city sought and obtained a writ of superintending control from the circuit court. The circuit judge held the ordinance to be valid and declared Judge Hague to be in error with respect to both of the grounds upon which he was holding the ordinance to be unconstitutional. Again, Judge Hague appealed to the Court of Appeals, which affirmed the circuit court and specifically held that the ordinance did not violate the constitutional right to bear arms and that the mandatory minimum sentence provision was valid, concluding with the statement:

"The ordinance is constitutionally sound." *Detroit v Recorder's Court Judge, Traffic & Ordinance Division,* 71 Mich App 414; 248 NW2d 566 (1976).

Notwithstanding the foregoing decisions of the Court of Appeals in 1974 and 1976 which affirmed issuance of writs of superintending control, Judge Hague continued, on at least eight occasions, from September, 1977 through October, 1978, to dismiss gun-control cases at the arraignment stage or found defendants not guilty after trial, or partial trial, citing precisely the same theories of unconstitutionality the Court of Appeals had rejected.

On these facts the commission found judicial misconduct in Judge Hague's intentional failure to follow stare decisis. Failure to follow stare decisis is not per se judicial misconduct. The Judicial Tenure Commission would be a singularly inappropriate forum in which to correct erroneous judicial decisions made in good faith. It may not function as an appellate body, Rule 1, Administrative Rules of the Judicial Tenure Commission, and to our knowledge has not undertaken to do so.

However, a judge is not free to willfully refuse to enforce the law. Code of Judicial Conduct, Canons 2, 3. In *Bennett,* p 199, we reminded the judiciary that it must

"strive toward creating and preserving the image of the justice system as an independent, impartial source of reasoned actions and decisions."

Where, as here, a judge's decision striking down a law as unconstitutional is directly contrary to appellate precedent of which he is aware and obviously based upon his widely publicized personal belief about what the law should be rather than what it is, the public perception of impartiality of the justice system is seriously harmed. Code of Judicial Conduct, Canon 2(B). In addition to his announced view that the gun-control ordinance is unconstitutional, despite appellate decision to the contrary, Judge Hague disagrees with the wisdom and the constitutionality of the mandatory minimum jail sentences required by both the prostitution and gun ordinances. On March 31, 1978, he announced from the bench his refusal to honor the sentencing provisions of both ordinances, stating: "I'm not going to impose any mandatory penalty."

When a panel of the Court of Appeals, having jurisdiction of a matter as it did in this case, declares a law to be valid and enforceable, a trial judge is bound by that decision until another panel of the Court of Appeals or this Court rules otherwise, whether he agrees with the decision or not. See *Hackett v Ferndale City Clerk,* 1 Mich App 6; 133 NW2d 221 (1965). A judge who may disagree with the appellate authority must, nevertheless, lay aside his own opinion of the validity of the law and dispose of the cases before him in accordance with the precedent. Whatever his contrary per-

sonal view of appellate authority, a judge is not free to disregard it. Code of Judicial Conduct, Canon 3(C); GCR 1963, 912. A judge must be "faithful to the law". Code of Judicial Conduct, Canon 3(A)(1).

Judge Hague not only disregarded the binding precedent announced by the Court of Appeals with respect to the constitutionality of the gun-control ordinance, he publicly declared his refusal to follow it, saying, as the record discloses:

"Do you know that the Court of Appeals doesn't establish the law in this state?

\*   \*   \*

"That decision I'm telling you—and you can communicate it to the judge who made it—is not binding on me. I don't have to follow that decision. The Court of Appeals doesn't make the law in this state.

\*   \*   \*

"The Court of Appeals can't substitute their judgment for me.

\*   \*   \*

"The Supreme Court makes the law in this state.

\*   \*   \*

"I'm going to give you another chance to go to the Court of Appeals. I sustain the finding of not guilty on all of the theories raised by the defendant: the preemption; that the offense did not take place in a public place; that the mandatory penalty violates the defendant's constitutional rights and that the mandatory penalty is inconsistent with the state statute which delegated the authority to enact penalties to the city, and that delegation the state said that the city could enact ordinances and provide for confinement and punishment, both in the discretion of the court.

"A mandatory penalty divests the court of its discretion."

We agree with the commission that in this case

respondent's dismissal of gun-control cases was not the result of reasoned judgment but the product of his personal prejudices. By his lack of reasoned enforcement of the ordinance in question and willful disregard of the law as enunciated by the Court of Appeals, Judge Hague violated his oath of office, engendered disrespect for the law and improperly interfered with the proper administration of justice. Const 1963, art 11, § 1; Code of Judicial Conduct, Canon 2(B); GCR 1963, 953(1).

## III. ABUSE OF THE CONTEMPT POWER

On September 11, 1978, from the bench and while court was in session, Judge Hague threatened Detroit Assistant Corporation Counsel Alfred Sawaya with contempt of court if he continued to bring prostitution cases into his courtroom for prosecution:

"*[Judge Hague]:* It is the order of this court that no further prostitution cases be brought into this courtroom, and they can be tried before a referee or any other judge in this court. Now whatever you want to do with them, that's your privilege.

"Mr. Representative of the Detroit Police Department and Officer, don't bring them in this courtroom anymore; that's an order of the court. If you do, I'm going to cite you for contempt of court the minute you walk through the court with the prostitutes; do you understand?

"*Mr. Sawaya:* I understand very clearly, your Honor."

The respondent does not deny this incident but suggests that the threat was in some way justified by the city corporation counsel's office continuing to bring such cases even after it was obvious that Judge Hague would simply dismiss them. Plainly, the decision whether to initiate proceedings under

the prostitution ordinance belongs to the prosecutor, not the trial judge. On that basis alone, to say nothing of the history of the matter as we have detailed it herein, we reject the assertion that the prosecutor could possibly be contemptuous merely for initiating the prosecution of prostitution cases under the Detroit ordinance.

The contempt power is awesome and must be used with the utmost restraint. See *People v Matish,* 384 Mich 568, 572; 184 NW2d 915 (1971). Abuse of the contempt power, including unjustified threats to hold persons in contempt, constitutes misconduct warranting discipline. *In re Del Rio,* 400 Mich 665; 256 NW2d 727 (1977), *app dis* 434 US 1029 (1978). The completely unjustified threat of contempt described above was "conduct prejudicial to the administration of justice" and an abuse of the court's contempt power warranting discipline. GCR 1963, 932.4(b)(iv); GCR 1963, 953(1); Code of Professional Responsibility and Canons, DR 1-102(A)(5).

### IV. IMPROPERLY EXCLUDING ATTORNEYS FROM THE COURTROOM

The Judicial Tenure Commission found that respondent infringed upon the authority of the Supreme Court to discipline and regulate members of the State Bar by ordering certain attorneys out of his courtroom in 1976 and 1978. Const 1963, art 6, § 5; GCR 1963, 957.1.

### A

Robert Horvath, an Assistant Corporation Counsel for the City of Detroit, had been assigned by his superiors to appear from time to time on behalf of the City of Detroit before Judge Hague in

connection with the prosecution of prostitution and gun-control ordinance cases. When the decision was made by his superiors in the Law Department of the City of Detroit to seek an order of superintending control, Mr. Horvath was assigned to appear and participate on behalf of the city. When he attempted to resume his representation of the city before Judge Hague on May 8, 1978, on the prosecution of ordinance matters unrelated to prostitution cases, he was ordered by the respondent to leave the courtroom. Evidence on the point includes the following transcript of the proceeding before Judge Hague:

"*Court Clerk:* Case Number Z-223105, People versus * * *. Charge is leaving the scene of an injury accident without identifying self, your Honor. Today is the date for a motion for a discovery and order for discovery motion to be heard today.

"*The Court:* Mr. Horvath, I think the propriety of this court and the order of this court is going to require me to relieve you of your assignment in here. You report back to your superiors. Do you understand that?

"*Mr. Robert Horvath:* Why is that, your Honor?

"*The Court:* I said because of the propriety of the court. I think in the best interests of the orderly procedure that you return to your courtroom—to your chief. I will excuse you from assignments in this court.

"*Mr. Horvath:* Very well, your Honor.

"*The Court:* Leave the arena of the law. I am excusing you.

"*Mr. Horvath:* I am just getting—

"*The Court: (Interposing)* Get your stuff together and leave."

On May 11, 1978, Judge Hague again refused to allow Mr. Horvath to practice law in his courtroom and informed him that the order was a standing one. On June 13, 1978, Mr. Horvath

entered Judge Hague's courtroom for the purpose of determining the disposition of certain cases. Judge Hague immediately and without any stated reason ordered his court officer to remove Mr. Horvath.

George Matish, Deputy Corporation Counsel for the City of Detroit, entered respondent's courtroom on May 8, 1978. It appears from the record that Mr. Matish interrupted the proceedings to register an objection on behalf of the city as to the manner in which respondent was conducting an arraignment of a defendant charged with a city ordinance violation. Respondent advised Mr. Matish that he would be permitted to remain in the courtroom to represent the city in the case previously called. Mr. Matish indicated that he did not intend to do so, continued to address the court concerning the general procedure being employed by respondent and refused to be seated when ordered by Judge Hague to do so. Respondent then ordered Mr. Matish from the courtroom. Like the Master, we think respondent was well within his authority to eject Mr. Matish in the circumstances.

Two days later, however, when Mr. Matish appeared in the courtroom to represent the city in scheduled matters, respondent stated:

"I don't intend to try the case that's before Judge Dunn in this courtroom. Are you listening to what I'm saying? You are a principal prosecutor in that case against me. Therefore, I am inhibited by your presence here. I'll not permit you to represent the People in this courtroom."

Mr. Matish declared that he was there to represent the City of Detroit in scheduled matters in which he believed the city had a right to be heard; that he was not being contemptuous and was not

there to litigate the "Judge Dunn case", and that he was not trying to inhibit the court in any way. Still, respondent ordered Mr. Matish to leave the courtroom. He did so.

On May 21, 1976, Gill S. Stevens, a sightless attorney employed by the City of Detroit as an Assistant Corporation Counsel, was representing the city in respondent's courtroom. After his matters were concluded and he was leaving the courtroom, Mr. Stevens was called back to the bench by Judge Hague and requested to "approve" a number of orders for the return, to certain defendants, of fingerprint records, arrest cards and related documents. Stevens indicated a reluctance to do so and requested permission to call his superiors. Respondent denied the request and told Mr. Stevens:

"You get somebody to read them to you if you don't know what's in them, all right?"

When Mr. Stevens asked who would read the proposed orders to him, respondent immediately declared that he found Mr. Stevens to be in contempt of court, announced a sentence of $100 fine or 30 days in jail and ordered Mr. Stevens placed in the prisoners' box. Shortly thereafter, Mr. Stevens was taken from the prisoners' box in the courtroom to the detention room which is a large cell or "bullpen".

Later, upon advice of his superiors, Stevens approved the proposed orders and was released. Respondent then ordered Mr. Stevens never to come into his courtroom again. The lawyer has complied with that order.

Counsel for the commission asserts in his brief that:

"MCL 600.1701; MSA 27A.1701 limits the power of courts to punish for contemptuous acts to either imposition of a fine or imprisonment.

"Absent a finding of contempt, a trial court cannot impose sanctions against an attorney on the basis of the court's 'inherent power'." Brief in Support of Commission's Findings, p 18.

To the extent that statement may suggest that a trial court may not eject an attorney from the courtroom for any reason absent an adjudication of contempt under MCL 600.1701; MSA 27A.1701, we reject it.

Since, as we have said, the contempt power is to be exercised with great restraint, *Matish, supra,* and a court should use the least possible sanction adequate to achieve the proper end sought, *People v Kurz,* 35 Mich App 643; 192 NW2d 594 (1971) (LEVIN, J.), *lv den* 387 Mich 756 (1972), a court necessarily has the inherent power to preserve or restore order by temporarily ejecting from the courtroom disruptive and disorderly persons, including attorneys. See Code of Judicial Conduct, Canon 3(A), subds (2) and (3). Every attorney or party has a full right to be heard. *Id.,* Canon 3(A)(4).

However, the power to remove disruptive attorneys may not be used as an artifice or guise to eject counsel with whom a judge has a personal or professional disagreement, whose presence "inhibits" the court, or toward whom the judge entertains a personal animosity but who is not, in fact, disruptive or disorderly.

It is evident from the record that Judge Hague barred Mr. Horvath from the courtroom on the occasions described and Mr. Matish on May 10, 1978 not because of any disruptive or disorderly conduct, but because of their respective roles on

behalf of the city in obtaining issuance of the orders of superintending control against respondent.

The power to discipline members of the State Bar, save a proper adjudication of contempt, particularly the power to limit or preclude an attorney from practicing law in any courtroom of the state, is reserved to the Supreme Court. Const 1963, art 6, § 5. See *In re Schlossberg v State Bar Grievance Board,* 388 Mich 389; 200 NW2d 219 (1972). See also MCL 600.904; MSA 27A.904.[10]

We find, as did the Master and the Judicial Tenure Commission, that, on the facts of record, the ejection of Attorneys Horvath on May 8 and 11, and June 13, 1978; Matish on May 10, 1978; and Stevens on May 21, 1976, with explicit orders to Horvath and Stevens that they were permanently barred from practicing law in respondent's courtroom, was unwarranted and unjustified and an abuse by the respondent of the powers of his office.

## B

The commission charges, and the Master and commission found, that respondent was guilty of misconduct for having "instructed" Assistant Prosecuting Attorney Thomas Smith in October, 1978, not "to authorize warrants for the statutory offenses of driving while license suspended if they were based on the defendants' failure to appear for prior moving violations". It appears that in re-

---

[10] "The supreme court has the power to provide for the organization, government, and membership of the state bar of Michigan, and to adopt rules and regulations concerning the conduct and activities of the state bar of Michigan and its members, the schedule of membership dues therein, the discipline, suspension, and disbarment of its members for misconduct, and the investigation and examination of applicants for admission to the bar."

sponse to that "instruction", Assistant Prosecutor Smith denied 16 warrant requests on October 26 and 27, 1978.

Counsel for the commission characterizes respondent's instruction to Assistant Prosecutor Smith as "a violation of the constitutional principle of separation of powers".

The commission found that respondent's conduct in that respect "violated the constitutional doctrine of separation of powers and [constituted an abuse of] the power of contempt inherent in respondent's office".

We disagree.

There is no evidence that Judge Hague's instruction to Assistant Prosecutor Smith was coupled with a threat of contempt. Further, the "instruction" to Mr. Smith, while beyond the respondent's authority, was not equivalent to action upon a matter before the court. Respondent is not charged with improperly dismissing such cases and there is no evidence he did so. Gratuitous advice to the law enforcement authorities of the executive department not to prosecute certain cases, adopted by those authorities without threat of contempt or other sanction, is not a "violation of the constitutional doctrine of separation of powers" and is not an abuse of judicial authority.

## V. CONCLUSION

The tale which unfolds upon a reading of the hundreds of pages of testimony, exhibits, briefs, and findings of fact and conclusions of law, is of a trial judge at ideological war with local prosecuting authorities over enforcement of non-traffic ordinances with the substance of which he does not agree. His longstanding and outspoken public op-

position to the mandatory minimum penalties of the City of Detroit prostitution and gun-control ordinances led him to frustrate enforcement of this ordinance with every means at his disposal during his periodic two-week term as presiding judge. His depth of conviction that the ordinance penalties are unjust blinded him to an appreciation of the limits of his adjudicative role in the criminal justice process, and moved him to deny the authority of higher courts who declared he was in error and ultimately led him to disobey those orders because he did not agree with them. In the process he abused the contempt power of his office by threatening punishment to those who, in accordance with their own oath of office, attempted to follow and enforce the law he opposed. When that failed he attempted to usurp the authority of the Supreme Court by improperly denying three attorneys their right to practice law in the courtroom in which they, like he, were assigned to serve.

It was in his inability to separate the authority of the judicial office he holds from his personal convictions that Judge Hague lost his way. In the particulars described, unable to see that he was the servant of the law and not its embodiment, he set himself above it.

As a sister court declared recently:

"An intoxication with judicial power which would ignore basic constitutional precepts is a wholly unacceptable syndrome that cannot be tolerated * * *. To brook it in a single courtroom would not only degrade the courts in general, but would affront the vast majority of * * * judges who perceive their courtrooms as 'place[s] of justice', rather than arenas for exhibitionism by display, before an intimidated audience, of naked and illegal judicial power." *In the Matter of Yengo,* 72 NJ 425, 450; 371 A2d 41, 57 (1977).

Judge Hague's disobedience of superior court orders, refusal to follow settled and binding case precedent, abuse of the contempt powers and unjustified exclusion of attorneys from the courtroom is a mosaic of willful misconduct designed solely to frustrate enforcement of laws he was oath-bound to uphold. It was repeated and defiant and, because of the widespread publicity given it within the courtroom and in the community at large, can only have seriously damaged public esteem for the judiciary in general, engendered disrespect for the law, exposed the courts to obloquy, contempt, censure and reproach and brought ridicule upon Judge Hague as a judicial officer.

We conclude that in all four types of misconduct detailed hereinbefore,[11] the respondent failed to uphold his oath to faithfully discharge the duties of his office, Const 1963, art 11, § 1; undermined the "integrity and independence of the judiciary", Code of Judicial Conduct, Canon 1; created "impropriety and the appearance of impropriety", *id.,* Canon 2; failed to maintain the integrity of the legal profession, Code of Professional Responsibility and Canons, Canon 1; engaged in conduct prejudicial to the proper administration of justice, Code of Professional Responsibility and Canons, DR 1-102(A)(5), GCR 1963, 953(1) and 932.4(b)(iv); exposed the courts to "obloquy, contempt, censure and reproach", GCR 1963, 953(2); and therefore failed to conform his behavior to the applicable standards of conduct, GCR 1963, 952.1 and 953(4).

We adopt the recommendation of the Judicial

---

[11] The supplemental complaint to Formal Complaint No. 23 is the sole basis for the Court's decision in this case. Although a motion was made and opposed to supplement the record before the commission, it appears that the opinion was issued without accepting any supplemental information. All allegations of judicial misconduct not contained in this record must be raised, if at all, in another formal complaint.

Tenure Commission and order Judge William C. Hague be suspended without pay from the discharge of all his judicial duties or administrative responsibility for a period of 60 days.[12] Final process to effectuate this order of suspension shall issue immediately upon release of this opinion.

COLEMAN, C.J., and KAVANAGH, WILLIAMS, LEVIN, FITZGERALD, and BLAIR MOODY, JR., JJ., concurred with RYAN, J.

[12] We recognize that the judicial duties and responsibilities from which we suspend respondent are those of a judge of the Recorder's Court, the Traffic and Ordinance Division of that court having been abolished. See fn 1.